# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| DAVID ALEJANDRO ZAPATA DOMINGUEZ, | ) ) ) |
| Petitioner | ) ) Case No. 3:24-cv-01154 |
| v. | ) ) JUDGE CAMPBELL ) MAGISTRATE JUDGE FRENSLEY |
| MABELIN ALEYDA PEREZ RAMIREZ, | ) ) ) ) |
| Respondent. | ) |

## MEMORANDUM

Petitioner David Alejandro Zapata Dominguez claims his daughter S.S.Z.P. (the "child"), who is now seven years old,[1] was wrongfully retained and removed from her place of habitual residence in Puebla, Mexico, and brought to the Middle District of Tennessee by the child's mother Mabelin Aleyda Perez Ramirez in December 2023. Pending before the Court is Petitioner's Verified Complaint and Petition for Return of Child pursuant to the Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act seeking an order to return the child to Mexico for a custody determination by the courts there. (Doc. No. 1).

For the reasons stated herein, the Petition for return of the child to Mexico is **DENIED**.

---

[1] The child was six years old when the Petition was filed.

## I. BACKGROUND[2]

Petitioner David Alejandro Zapata Dominguez and Respondent Mabelin Aleyda Perez Ramirez were married in Mexico on October 27, 2017. (Tr. 19; Pet. Ex. 1). Their child was born on April 4, 2018. (Tr. at 21; Pet. Ex. 2). Petitioner, Respondent, and the child lived in their own apartment in Queretaro, Mexico until September 9, 2020. (Tr. 26). Sometime before September 9, 2020, they decided to go to Guatemala where Respondent's family lived. (*Id.*).

Petitioner, Respondent and the child went to Guatemala on September 9, 2020. The child was then two years and five months old. Whether this was intended to be a more permanent move or a temporary visit is in dispute. Both parties testified, however, that in preparation for leaving for Guatemala, they sold their belongings, including a refrigerator. (Tr. 32, 66). There was no testimony about the intended duration of their stay or evidence of arrangements for return to Mexico.[3]

In Guatemala, Respondent, Petitioner, and the child lived in a house provided by Respondent's parents and Petitioner operated or worked at a convenience store owned by Respondent's parents. (Tr. 33-34). Petitioner testified that the store did not perform well and that he drank alcohol while working at the store because Respondent was cheating on him. (Tr. 35; *see also* Tr. 70).

---

[2] The facts stated in this section are drawn from evidence and testimony from the March 31, 2025 hearing. A transcript of the hearing is filed at docket entries 61 and 62. For ease of reference, the transcript is cited as "Tr. [page]." Although the testimony of Petitioner and Respondent diverges on a few key points, which are discussed in more detail later in this Memorandum, to the extent possible, the Court has attempted to glean the undisputed facts and to draw its conclusions from those undisputed facts.

[3] During the hearing, when questioning Petitioner, counsel for Petitioner referred to the family's relocation to Guatemala as a "trip" to visit Respondent's family that was temporary travel (Tr. 26, 45), and counsel for Respondent referred to the travel as a "move" (Tr. 33, 38). Petitioner answered the questions in the affirmative. The Court recognizes that distinctions in meaning between these phrases could be lost in translation and, therefore, affords this testimony little weight. At no point, however, was there testimony from either party that they planned to stay in Guatemala for a specific duration.

2

Petitioner testified that during their time in Guatemala, he grew concerned for the child's welfare due to lack of resources such as running water and electricity, and because there were "rats walking all over our beds." (Tr. 26). Petitioner requested they return to Mexico, but Respondent refused. (Tr. 26-27). Petitioner testified that when he told Respondent he would take the child to Mexico she told him he would be beheaded before he reached the border. (Tr. 27). Respondent denied that she or anyone in her family threatened to kill him. (Tr. 69).

Ultimately, in April 2021, after approximately six months in Guatemala, Petitioner returned to Mexico alone. (Tr. 28). In July 2021, he filed a Hague Application in Mexico seeking return of the child from Guatemala to Mexico. (Tr. 28; Pet. Ex. 5). In the Petition, Petitioner alleged the home in Guatemala lacked clean drinking water, electricity, and internet; and that the child did not have access to vaccinations, was malnourished, and not properly clothed. (Pet. Ex. 5). The 2021 Hague Application was forwarded to and investigated by the Guatemalan Office of the Attorney General (the Procurauria General De La Nacion ("PGN")). (Res. Ex. 2).

The PGN investigation included an unannounced home visit in May 2022, when the child was four years old. (*Id*.). The PGN concluded that the child was in visibly good condition, healthy, and with proper hygiene; the child received recommended vaccinations in April 2022; the household had electricity, potable water, and internet; that Petitioner had been living with them "but decided to return to Mexico, abandoning the household;" and that there was no evidence of "rights violations or mistreatment in any form." (*Id*.). The report noted that the child reported good relationships with her family in Guatemala, including her aunt, uncle and cousin. (*Id*.). Based on the investigation, the report recommended that the child "remain under the care and protection of her mother." (*Id*.). Petitioner received the PGN findings. (Tr. at 40). He took no further legal action with regard to the 2021 Hague Petition and did not file a custody case in

3

either Guatemala or Mexico. (Tr. 43-44). Petitioner has had no contact with Respondent or the child since December 2021. (Tr. 36).

Respondent lived in Guatemala with the child until they moved to Gallatin, Tennessee in December 2023.

## II. PROCEDURAL HISTORY

In January 2024, Petitioner filed an application for the return of the child to Mexico under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"). In April 2024, the United States Department of State notified Respondent of Petitioner's Hague Application. Petitioner initiated this action on September 24, 2024, by filing a verified complaint and petition for return of the child to Mexico. (*See* Doc. No. 1). The next day, Petitioner filed a motion for temporary restraining order prohibiting Respondent from removing the child from the jurisdiction of this Court and requiring Respondent to surrender her and the child's travel documents and passports pending a hearing on the merits of the Verified Complaint. (*See* Doc. Nos. 7, 8). On September 26, 2025, the Court ordered that the Petition and Motion for Temporary Restraining Order be served on Respondent by the United States Marshall, ordered the Respondent to respond to motion for temporary restraining order by October 7, 2024, and set a hearing on the motion to temporary restraining order for October 11, 2024. (Doc. No. 11).

Respondent was served in person on October 2, 2024. (Doc. No. 14). The Court held a hearing on the motion for temporary restraining order on October 11, 2024. Counsel for Petitioner appeared at the hearing. Respondent did not appear at the hearing or otherwise respond. At the hearing, counsel for Petitioner withdrew the request that Respondent be ordered to surrender her and the child's travel documents and asked that the temporary restraining order direct Respondent and the child to remain in the District pending resolution of the Petition. The

4

Court granted the motion, as modified, and ordered Respondent not to remove the child from the jurisdiction of the Court pending resolution of the Petition. (Doc. No. 16).

On October 31, 2024, Respondent filed a written response in Spanish. (Doc. No. 20). Because Petitioner and Respondent communicate in Spanish and a number of the exhibits were Spanish-language documents, the Court ordered Petitioner to obtain the services of a translator to serve at the hearing and to file certified translations of Spanish-language documents, including Respondent's response. On November 15, 2024, Petitioner identified a translator who was approved by the Court on November 18, 2024. (Doc. Nos. 22, 25). Petitioner filed certified translations on December 13, 2024. (Doc. No. 26). After discussion with counsel for Petitioner regarding available dates, the Court set a hearing for February 11, 2025. (Doc. No. 29).

On February 11, 2025, Petitioner appeared via video teleconference; his attorneys and the translator appeared in-person. Respondent appeared in-person *pro se*. After a brief discussion with the parties, the Court determined that it would be beneficial for Respondent to proceed with the assistance of counsel and continued the hearing. The next day, counsel entered an appearance on behalf of Respondent. (Doc. No. 37). The hearing was then rescheduled for March 31, 2025. (Doc. No. 40).

On March 31, 2025, the Court held a hearing at which Petitioner and Respondent were represented by counsel. The parties filed additional briefing following the hearing. (*See* Doc. Nos. 63, 64, 66, 67). It is on this record that the Court considers the Petition to return the child to Mexico.

### III. LEGAL STANDARD

This matter arises under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act, 22

U.S.C. § 9001, *et seq*. "The Hague Convention was adopted by the signatory nations 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986)). "It is the Convention's core premise that 'the interests of children … in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (citing Convention Preamble).

Mexico, Guatemala, and the United States are signatories to the Hague Convention. (Joint Stipulation ¶ 2, Doc. No. 57). Congress ratified and implemented the Hague Convention by enacting the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*, which sets forth procedures for implementation of the Convention in the United States and grants the United States District Courts jurisdiction over actions arising under the Convention. 22 U.S.C. §§ 9001(b), 9003. ICARA requires that the Petitioner establish that the child has been wrongfully removed within the meaning of the Convention by a preponderance of the evidence. 22 U.S.C. § 9003(e).

Under the Hague Convention, "a child wrongfully removed from her country of 'habitual residence' ordinarily must be returned to that country." *Monasky*, 589 U.S. at 70-71. "The most important determination that a court makes when resolving a petition brought pursuant to the Hague Child Abduction Convention is that related a the child's place of habitual residence." *Rodrigues Dos Santos Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901 at *3 (6th Cir. Jul. 20, 2023).

Here, Petitioner asserts the child's habitual residence is Mexico and requests the Court order her return to Mexico.[4] Accordingly, the Court begins by determining whether the child's habitual residence was Mexico at the time of the alleged wrongful retention or removal. Because the Court finds that it was not, the inquiry ends there.

"Habitual residence" is not defined by the Convention. Instead, the Court must engage in a fact-driven inquiry to determine the place where the child is "at home" at the time of the retention or removal. *Monasky*, 589 U.S. at 77 (citing *Karkkanien v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006)). As the Supreme Court recently explained:

> [b]ecause locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.

*Id.* at 78 (internal citations omitted). A child's residence in a particular country is "habitual" only if it is more than transitory. *Id.* at 76. It is not dependent on agreement between the child's parents, but "'mere physical presence' … is not a dispositive indicator of an infant's habitual residence." *Id.* at 77, 81. Instead, the Court looks to "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place" to determine whether an infant's residence in that place has the quality of being habitual. *Id.* at

---

[4] Petitioner could have requested the child be returned to her state of habitual residence, which would leave open the possibility of return to a country other than Mexico if the requirements of the Hague Convention are satisfied. Petitioner's request, however, is specifically that the court order the child returned to Mexico. Accordingly, the Court limits its review of the Petition to whether Mexico is the child's habitual residence.

7

81. Ultimately, the goal is "to ensure that custody is adjudicated in what is presumptively the most appropriate forum – the country where the child is at home." *Id.* at 79.

Petitioner asserts both the wrongful retention of the child in Guatemala in April 2021 through December 2023, and the wrongful removal of the child to the United States in December 2023. Because the child has not been physically present in Mexico since September 9, 2020, if she was not a habitual resident of Mexico in April 2021 there is no basis for her to have become so after that date. Therefore, for purposes of the instant Petition, the Court need only determine whether Petitioner has established that the child was a habitual resident of Mexico at the time of the initial alleged wrongful retention in April 2021.

## IV.   ANALYSIS

On March 31, 2025, the Court held a hearing at which Petitioner and Respondent were represented by counsel. Petitioner, Petitioner's brother, Gustavo Zapata, and Respondent testified during the hearing, and the parties admitted a total of seven exhibits, including the July 2021 and January 2024 Hague Applications, and the Report from PGN. (Hearing Transcript, Doc. No. 61 and sealed Doc. No. 62; Petitioner's Exs. 1-6; Respondent's Exs. 1-2).

Respondent's and Petitioner's recollections of events leading to their move with the child to Guatemala, their plans regarding the duration of stay, what took place while they were in Guatemala, and the circumstances of Petitioner's return to Mexico are not entirely consistent.[5] Where their stories diverge, the Court finds Respondent's account more credible.

The Court's assessment of the witnesses' demeanor and testimony, was, of course,

---

[5] Also in dispute is Respondent's claim that Petitioner mistreated her while they were in Mexico. The Court makes no findings regarding the credibility of the parties' testimony on this topic because it has little relevance to the issues before the Court. Respondent does raise a defense under Article 13 that returning the child to Mexico would place her at a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation.

hampered by the language barrier and use of an interpreter. For example, Petitioner answered in the affirmative that he "traveled to Guatemala temporarily" (Tr. 45), but also that they "moved to Guatemala," suggesting a more permanent move. (Tr. 33, 38). The Court recognizes that the choice of words may have been that of the attorneys asking the questions rather than indicative of the parties' intentions with regard to their stay in Guatemala and that some nuance may have been lost in translation.

Overall, the Court found Respondent more credible than Petitioner, particularly with regard to testimony concerning the move to Guatemala, their time there, and his decision to return to Mexico. This is due, in part, to Petitioner's demeanor when answering questions about his time in Guatemala and his work at Respondent's family's store, and also because the PGN found many of the claims he made in the 2021 Hague Application with regard to the child's living conditions were unsubstantiated.[6] With this in mind the Court turns to an assessment of the child's habitual residence immediately before her alleged unlawful retention in April 2021.

It is undisputed that the child lived in Queretaro, Mexico from her birth on April 4, 2018, until September 9, 2020, when Petitioner, Respondent, and the child relocated to Guatemala when the child was two years and five months old. She then lived in Guatemala with her parents for approximately six months until Petitioner returned to Mexico in April 2021 just before her third birthday.

Given the child's very young age, she had no real ability to acclimate to the community. Instead, her interactions were limited to her immediate caregivers and her extended family. In that regard, the intentions of her caregivers are an important consideration for whether the child

---

[6] The Court recognizes that it is possible, though not likely, that the living conditions in the town changed dramatically in the year between Petitioner's 2021 Hague Application and the PGN's investigation. However, the fact that *none* of the alleged conditions were found on an unannounced visit, casts doubt on the credibility of those accusations.

9

was "at home" in Guatemala or merely transitory. The evidence suggests Petitioner and Respondent's stay in Guatemala was not transitory or intended to be transitory. They both testified that in preparation for the move to Guatemala, they sold the belongings, including a refrigerator. (Tr. 32, 66). This suggests they did not intend to return, though no one testified to that. Their actions in Guatemala also suggest that the stay was more than transitory. They lived in a village with Respondent's family in a house provided by Respondent's parents. (Tr. 33, 67). Though Petitioner stated that he was "not allowed to work," he also stated that he "operated" a convenience store while in Guatemala. (Tr. 34). Respondent testified that her parents gave them the store to operate so they could earn a living there. (Tr. 67). Nothing indicates that the stay was to be short-term until Petitioner decided he and the child should return to Mexico.

The reason for that decision is disputed. Petitioner claims it was out of concern for his child's well-being. (Tr. 26). But there was also testimony that the store was not performing well, that the relationship between Petitioner and Respondent was rocky, and that Petitioner had developed poor relationships with others in the community. (Tr. 35, 67). Ultimately, Petitioner's actual reason for deciding to return to Mexico, does not affect the analysis because none of the potential reasons suggest that the stay in Guatemala was meant to be short-term. It appears the family settled in the town, operated a business, and made a home.

The Court also considers the length of time the child was in Guatemala before the alleged unlawful retention (6 months) as compared to the length of time she lived in Mexico (2 years, 5 months). Though not irrelevant, the time periods give little indication as to the degree of acclimatization of such a young child who was in the care of the same primary caregivers in both locations. Six months is ample time for a young child to form meaningful relationships with extended family, particularly when they live in close proximity as they did here.

10

Case 3:24-cv-01154   Document 68   Filed 05/19/25   Page 10 of 12 PageID #: 462

On this record, having considered the totality of the circumstances, the Court finds Petitioner has failed to show by a preponderance of the evidence that the child's habitual residence in April 2021 was Mexico. At that time, she had been living with her parents in Guatemala for six months and the parents themselves evidenced a degree of settled purpose in Guatemala by forming relationships with Respondent's family, operating a business to try to make a living, and setting up a home. Conversely, there is no evidence, other than Petitioner's testimony that they were "traveling to Guatemala temporarily," to suggest that the move was, in fact, temporary.

This decision is consistent with that of the PGN, Guatemala's central authority for Hague Convention petitions. Although PGN did not make an express finding of habitual residence, it investigated Petitioner's 2021 Petition and concluded that the child should remain in Guatemala with her mother.[7] Petitioner did not initiate custody proceedings in Guatemala.

This ruling is limited to the finding that Petitioner has not established by a preponderance of the evidence that the child's habitual residence is Mexico. Because it is not necessary to do so, the Court makes no findings about where her habitual residence *is*, whether the retention or removal was wrongful, whether Petitioner was exercising his parental rights, or the availability of affirmative defenses.

---

[7] The Court has reviewed the PGN's findings related to the child's relationships with family members and integration into the community, but finds they are not particularly probative of whether the child was "at home" in Guatemala a year before PGN's assessment.

## V. CONCLUSION

For the reasons stated, the Court finds Petitioner has not established that Mexico is child's state of habitual residence. Accordingly, the Petition to return the child to Mexico is **DENIED**. In light of this decision, the Court need not conduct an *in-camera* hearing of the child to determine whether she is of sufficient age and maturity to take into account her views. Therefore, the motion to do so (Doc. No. 53) is also **DENIED**.

An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE